**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger**

Civil Action No. 16-cv-01782-MSK-KMT

IQASR LLC,

      Plaintiff,

v.

WENDT CORPORATION,

      Defendant.

---

### OPINION AND ORDER CONSTRUING CLAIMS

---

**THIS MATTER** comes before the Court pursuant to the parties' Joint Motion **(# 120)** for determination of disputed claims and the associated briefing **(# 114, 117, 118)** and supporting materials[1]; the Defendant's ("Wendt") Motion to Exclude the Opinions of Michael Nranian[2] **(#108)**, the Plaintiff's ("Iqasr") response **(# 112)**, and Wendt's reply **(#113)**; Wendt's Motion to Supplement[3] **(# 123)** its claim construction briefing, Iqasr's response **(# 124)**, and Wendt's reply **(# 128)**; Wendt's Motion to Supplement **(# 130)** its invalidity contentions, Iqasr's response **(#138, 139)**, and Wendt's reply **(# 142, 144)**; and motions by both parties to restrict **(# 150, 153)** public access to certain filings.

---

[1]     The court is sufficiently apprised of the parties' positions through their filings and does not require an evidentiary claim construction hearing.

[2]     The Court denies that motion as moot. Mr. Nranian's opinions, if considered by the Court, would not alter the analysis herein.

[3]     The motion seeks to introduce evidence of a Patent Office Action on a related patent, in which Iqasr uses different claim terms than those presented here. This Court finds that the record of the Office Action would not materially assist in the construction of the specific claim language in the '432 Patent and thus denies the motion to supplement.

## FACTS and JURISDICTION

Iqasr is the owner of U.S. Patent No. 9,132,432 ("the '432 Patent" or simply "the patent"), which describes "Isotropic Quantization Sorting Systems of Automobile Shredder Residue to Enhance Recovery of Recyclable Materials."  More simply, the invention describes using various methods – primarily air streams and wind tunnels -- to sort "automobile shredder residue" which results when junked automobiles are shredded for disposal.  The patent's goal is to enhance the ability of recyclers to reclaim economically-valuable quantities of various non-ferrous metals, glass, rubber, plastics, and other materials or recycling, a task which often requires the removal of a common, non-recyclable substance known as "magnetic fuzz."  Wendt is a competitor in the industry of manufacturing automobile recycling equipment.  Iqasr alleges that in 2013, under the false pretense of potentially entering into a licensing arrangement, Wendt representatives toured Iqasr's facilities and examined Iqasr's equipment that embodied the '432 patent.  Iqasr further alleges that, despite being informed that the equipment was patented, Wendt proceeded to incorporate aspects of the '432 patent into Wendt's own equipment.  Based on these allegations, Iqasr asserts a single claim for infringement of the '432 patent. The Court exercises jurisdiction pursuant to 28 U.S.C. §1331.

### A.  Claim construction

The primary issue before the Court is construction of certain disputed terms pursuant to *Markman v. Westview Instruments*, 517 U.S. 370 (1996).  The parties' Joint Claim Construction Chart **(# 98)** identifies 11 terms requiring construction, although the parties agree on the appropriate construction of 4 of those terms,[4] leaving 7 in dispute.

---

[4] Wendt maintains indefiniteness objections to three of the four terms on which the parties otherwise agree on the appropriate construction.   In light of the construction given to the challenged terms here, it may be unnecessary for the Court to reach the indefiniteness challenges

1. <u>Claim construction generally</u>

The fundamental purpose of a patent is to give notice to others of that in which the inventor claims exclusive rights. *Oakley Inc. v. Sunglass Hut International*, 316 F.3d 1331, 1340 (Fed. Cir. 2003). Thus, the focus of claim construction is ascertaining how a reasonable competitor would interpret the actual claim language, not what the inventor subjectively intended the language to claim. *Id.* at 1340-41. The words used in the patent are evaluated according to their "ordinary and customary meaning," as would be understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). In some circumstances, the specification may reveal that the inventor specifically – albeit idiosyncratically – defined a term in a way that might differ from the meaning it would otherwise possess. Where the intrinsic record <u>clearly</u> discloses that the inventor resorted to his or her own peculiar lexicography, the Court will give effect to the inventor's unique idiom; however, where the inventor used particular words without giving a clear indication of an intent to endow them with an unusual meaning, the Court will give those words their ordinary and customary meaning in the art, notwithstanding the inventor's subjective intent to invoke a different definition. *See e.g. Laryngeal Mask Co. v Ambu*, 618 F.3d 1367, 1372 (Fed. Cir. 2010).

---

to the otherwise uncontested terms. To the extent it would be necessary for the Court to do so, the Court would be inclined to find that the term "substantially free" to be indefinite, but would likely reject indefiniteness challenges to the remaining terms.

As to the "substantially free" term, the paragraph in question, beginning at 12:5, describes two embodiments, one that produces products "without substantially any magnetic fuzz" and one that produces "an amount of magnetic fuzz that is less than a traditional amount of magnetic fuzz." The patent's subsequent description of "a traditional amount of magnetic fuzz" being "greater than about 10% volume" is referring to the second embodiment, not the one that results in a product "substantially free" of magnetic fuzz. Nothing else in the patent or the record herein provides any other metric for determining when a product is otherwise "substantially free" of magnetic fuzz.

In attempting to give meaning to the inventor's language, the Court "looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Phillips,* 415 F.3d at 1314. Among those sources are: (i) the words of the claims themselves; (ii) the remainder of the patent's specification; (iii) the prosecution history of the patent; (iv) extrinsic evidence concerning relevant scientific principles; (v) the common meanings of technical terms used; and (vi) the state of the art at the time of the invention. *Id.* Terms must be construed in light of the entirety of the patent, not just in the context of the particular claim(s) they appear in. *Id.* at 1313. In other words, claim language must be read in conjunction with the more general and descriptive specification portion of the patent; indeed, the specification is often "the single best guide to the meaning of a disputed term." *Id.* at 1315. Because the patent is examined as a whole, the Court assumes that claim terms will normally be used consistently throughout the patent, and thus, the meaning of a term used in one claim can illustrate the meaning of that same term used elsewhere in the patent. *Id.* at 1314.

As with the specification, evidence of the prosecution history of the patent can also be considered as intrinsic evidence of how the USPTO and the inventor understood the patent. *Id.* at 1317. The prosecution history reflects "an ongoing negotiation between the PTO and the applicant," and can sometimes demonstrate that the inventor limited or disclaimed some portion of a claim. *Id.* At the same time, because the prosecution history predates the final patent language, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Extrinsic evidence of disputed terms – that is, "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises"

– can also shed light on the proper construction to be given to those terms, but extrinsic evidence "in general [is] less reliable than the patent and prosecution history in determining how to read claim terms." *Id.* at 1318. The court in *Phillips* articulated a variety of reasons why a court construing a patent should be wary of relying too heavily on extrinsic evidence, and cautions that, while admissible and potentially probative, courts "should keep in mind the flaws inherent in each time of [extrinsic] evidence and assess that evidence accordingly." *Id.* at 1318-19.

2. Particular challenged terms

Iqasr alleges that Wendt infringed Claims 1-15, 18-20, and 22 of the '432 Patent. Of those, Claim 1 is the only independent claim. It claims (with disputed claim terms in bold):

> 1. A method of separation of **automobile shredder residue** comprising the steps of:
>
> providing automobile shredder residue as a result from a ferrous sorting recovery system;
>
> introducing said automobile shredder residue into an automobile shredder residue **sorting, non-ferrous recovery system**; [and]
>
> non-magnetically sorting **magnetic fuzz** from said automobile shredder residue with said automobile shredder residue sorting, non-ferrous recovery system;
>
> wherein said sorted magnetic fuzz is substantially free of **recyclable materials**.

The remaining disputed claim terms are found in Claim 11, 13, and 22. Those claim (with the disputed claim terms in bold):

> 11. A method of separation of automobile shredder residue according to claim 5 [which differs from claim 1 in that it claims a "wind tunnel sorting system" as the sorting, non-ferrous recovery system] and further comprising the step of **flowing vertical air** in said wind tunnel sorting system. . .

13. A method of separation of automobile shredder residue according to claim 1 wherein said step of non-magnetically sorting magnetic fuzz . . . comprises the step of non-magnetically sorting separating **low susceptance microparticles** from said automobile shredder reside with . . . said sorting, non-ferrous recovery system . . .

22. A method of separation of automobile shredder residue according to claim 6 [which incorporates "path directed air sorting"] wherein said step of path directed air sorting . . . comprises the step of **vertical path directed air sorting** said automobile shredder residue.

With those claims in mind, the Court turns to the disputed terms.

(a). "automobile shredder residue" (hereafter, "residue")

Iqasr proposes that this term be construed as "materials that remain in the material stream through the sorting, non-ferrous recovery system after the ferrous sorting recovery system has removed some ferrous metal from the stream exiting the automobile shredder." Wendt proposes that the term be construed to mean "materials that remain in the material stream after the ferrous sorting recovery system has removed some ferrous metal from the stream exiting the automobile shredder." Thus, the difference in the parties' construction is Iqasr's addition of the phrase "through the sorting, non-ferrous recovery system."

The patent explains that discarded automobiles, trucks, and even household appliances can first be shredded by powerful machines, resulting in "a plurality of shredded pieces." 4:15. Typically, these pieces are then passed through a "sorter" – often magnetic -- designed to extract pieces of ferrous metals. 4:19-25. The remaining material will consist primarily of non-ferrous materials such "stainless steel, copper, brass, zinc, aluminum, lead, and the like," as well as undesirable "magnetic fuzz, dirt, non-metallic waste, trash," and other materials. 4:43-53. This material moves on to a "non-ferrous recovery system." 4:35-36. The patent describes several methods by which the non-ferrous material may be further sorted by using air flows of various

6

types – such as through "Z-boxes" or "cyclones" -- to separate the components by their relative densities or weights so that they may be collected and recycled (or discarded, if the sorted material is valueless). It emphasizes that "in past systems, no one has air sorted materials after the ferrous recovery system." 5:62-63.

As sharpened by the parties' briefing, the difference in their proposed constructions concerns the question of whether the "residue" in question must maintain precisely the same composition it had as output from the ferrous sorting system, or whether the "residue" retains that label even though the non-ferrous sorting process removes various components of it. Put differently, imagine a sorting system consisting of three components – a ferrous sorter, followed by a non-ferrous sorter that removes magnetic fuzz, followed by a non-ferrous sorter that sorts the remaining metals by density. Under Iqsar's construction, the stream exiting the ferrous sorter is the labeled "residue", and remains "residue" after passing through the fuzz removal process and through the non-ferrous metal sorter (and perhaps even remains "residue" for some period thereafter), even though the composition of the stream being sorted changes as matter is removed from it. Wendt's construction also labels the stream that exits from the ferrous sorter as "residue", but Wendt argues that the term "residue" no longer applies once components ( for example, magnetic fuzz) is removed from the stream.

Wendt argues that because Claim 1 refers to "<u>said</u> . . . residue" being moved from the ferrous to the non-ferrous sorter, the second subclause of Claim 1 must be referring to the identical "residue" identified in the first subclause – namely, the unsorted stream emerging from the ferrous sorter. But the '432 Patent does not suggest that the concept of "residue" is a stream of materials that is fixed and unchanging; to the contrary, several references in the patent refer to "residue" that has already been partially-sorted. For example, the patent states that "residue may

be air sorted in an air-locked [ ] residue sorting system and at least one sorted collection of sorted [ ] residue may be collected." 4:65-5:1. The concept of "sorted [ ] residue" is inconsistent with Wendt's proposed construction, as the "sorting" of the residue necessarily removes or segregates some components of the pre-sorted stream, yet the patent continues to label the "sorted" collection as "residue." Similarly, the patent states that "[s]orting of magnetic fuzz from [ ] residue may be run one time perhaps as a single stage sort [or] may be repeated for a number of times." 7:12-14. Under Wendt's construction, it would be impossible to sort fuzz from "residue" a second time, as the first iteration of sorting that fuzz removed some amount of components from the original stream, making it no longer eligible to be called "residue." Nevertheless, it is clear from the patent's language that "residue" with some amount of fuzz removed nevertheless remains "residue." Similarly, the patent discusses a "specialized sorting system" that may separate materials into categories including "zorba, zurik, trash, nonferrous trash, automobile shredder residue or the like." 18:27-29. Once again, the concept of "residue" persists despite the fact that some components of the stream –*e.g.* zorba, zurik, trash, and nonferrous trash – have been separated from it.

Accordingly, it is clear to the Court that the patent's references to "automobile shredder residue" describe a stream of materials that retains that character even as components of the stream are sorted or removed in part or whole. Because Iqasr's proposed construction reflects that concept and Wendt's does not, the Court adopts Iqasr's proposed construct. "Automobile shredder residue" is construed to mean "materials that remain in the material stream through the sorting, non-ferrous recovery system after the ferrous sorting recovery system has removed some ferrous metal from the stream exiting the automobile shredder."

Iqasr proposes that this term be construed to mean "equipment that receives automobile shredder residue from a ferrous sorting recovery system and separates it into one or more constituent parts."  Wendt contends that the term is not supported by the specification and is therefore indefinite, but contends that to the extent a construction is warranted, that construction should be "equipment that receives automobile shredder residue from a ferrous sorting recovery system and, without the use of magnetism, separates it into one or more constituent parts."

The Court pauses here to address the issue of indefiniteness.  A claim is indefinite when its claims, "read in light of the specification delineating the patent, . . . fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  If the claims contain words or phrases whose meaning is unclear due to the lack of any antecedent basis, or whose meaning is "purely subjective and depends on the unpredictable vagaries of any one person's opinion."  *In re Downing*, ___ Fed.Appx. ___, 2018 WL 6436437 (Fed. Cir. Dec. 7, 2018); *Intellectual Ventures I, LLC v. T-Mobile, USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018).  But the purpose of a patent is to give notice to others skilled in the art about the scope of the invention with reasonable certainty, and thus, a claim is not indefinite if it apprises a person of ordinary skill in the art of its scope and thus provides adequate notice, even if it does not have an antecedent basis in the specification.  *Id.*; 35 U.S.C. § 112.

The phrase "sorting, non-ferrous recovery system" does not appear in the specification of the '432 Patent; it is used only in the claims.  The phrase "non-ferrous recovery system" is commonly used in the patent, as is the adjective "sorting," but the two concepts are first combined with the statement that "a[ ] residue **sorting** system may be used in a **non-ferrous**

**recovery system**." 5:8-9 (emphasis added). This passage goes on to state that "any kind of sorting system may be used," giving examples of a Z-box or a cyclone. 5:10. This language suggests that a component that sorts residue – *e.g.* a Z-box or cyclone -- may be integrated into a non-ferrous recovery system to create a "sorting, non-ferrous recovery system."

But stating that a "sorting system" may be used to render a "non-ferrous recovery system" into a "sorting, non-ferrous recovery system" simply focuses the indefiniteness question onto the sufficiency of the particular term "sorting." As the patent concedes, "traditional sorting systems" include such diverse methods as "magnets, eddy current, air separation perhaps only as an air sensor puff, flotation, screening, sensor sorting, induction sensor sorting, and X-ray," presumably among others. 2:3-5, 8. Most of the specification in the '432 Patent is focused on using air flows of various types to accomplish the "sorting," but the patent is clear that it considers "any kind of sorting system" to suffice. Although such language is incredibly broad (and the Court does not express an opinion as to whether that overbreadth would likely prove fatal to the claim on some other ground), the mere fact that a claim is broad does not make it indefinite. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005). Here, a person of ordinary skill in the art would understand that any system that sorts residue in <u>any</u> way would be encompassed by the challenged language, and thus, the Court finds that the challenged language is not indefinite.

The Court then turns to the parties' competing constructions, which differ only as to whether the "sorting" described must be accomplished by non-magnetic means. Again, although the specification often focuses on non-magnetic means for sorting components and removing magnetic fuzz, it does not wholly disclaim the use of magnets. To the contrary, the patent expressly contemplates that "separation of low susceptance microparticles from [ ] residue

10

could be any type of system[,] including but not limited to a pencil or even small type of magnet." 6:31-35. It goes on to state that "a magnet may be one that may be able to be inserted or stirred in or the like into a collection of non-ferrous components and can pick up substantially only magnetic fuzz." 6:35-39. Thus, the specification contemplates the possibility that magnets and magnetism may be used as part of a sorting, non-ferrous recovery system. Moreover, the Court notes that the concept of non-magnetism is contained in a subsequent claim term in Claim 1 – "non-magnetically sorting magnetic fuzz" – and the Court is reluctant to read a limitation found in one claim term into a different claim term. Accordingly, the Court adopts Iqasr's proposed construction and construes the term "sorting, non-ferrous recovery system" to mean "equipment that receives automobile shredder residue from a ferrous sorting recovery system and separates it into one or more constituent parts."

(c). "magnetic fuzz"

Iqasr proposes that this term be construed to mean "magnetically active disassociated microparticles." Wendt contends that the term is indefinite, and, if not, that it should be construed to mean "a non-recyclable substance comprising at least some ferrous metal entangled with fine, light fibers or particles."

The patent frequently uses the term "magnetic fuzz," but never describes it with any particular specificity. At most, the Court can discern the definition of "magnetic fuzz" only by reference to those instances where the patent describes it indirectly or by example. The term "magnetic fuzz" is most commonly used as one example of what the patent describes as "low susceptance microparticles." Examples of such low susceptance microparticles "could be magnetic fuzz, iron oxide particles, microparticles, dust, trash, ferromagnetic particles," and so on. 6:7-10. The patent also indicates that such low susceptance microparticles "may be

magnetically active disassociated particles with low magnetic or perhaps even low sensor susceptibility, such [a]s but not limited to magnetic fuzz." 6:18-21. It states that magnetic fuzz may fit within the category of "disassociated magnetically active microparticles because these particles may be difficult to substantially identify," suggesting that magnetic fuzz bears that characteristic as well. 6:27-29. The patent makes clear that magnetic fuzz is "undesirable" when mixed in with "good recyclable components." 7:9-11, *see also* 12:3-4 (presence of magnetic fuzz renders copper "unclean, trashy[, and] unsalable"). Magnetic fuzz comes in several varieties including "light density magnetic fuzz" -- that is "particles that are magnetic but may be light in weight," and "lightly magnetic magnetic fuzz" -- that is "particles that are magnetic but may be weakly magnetic." 77:50-53.

Parsing some of the terms quoted above is complicated by the fact that the patent seems to offer its own definitions of many of the terms it uses to even describe magnetic fuzz. Although it is clear that the patent defines magnetic fuzz as a kind of "microparticle," the patent does not define *that* term, except perhaps to note that a microparticle "may be small[,] perhaps less than about one inch in size or the like." 6:10-11. (The use of the term "may be" is curious here, suggesting that a microparticle might also be *larger* than one inch in size.) The patent indicates that magnetic fuzz is a "disassociated" form of microparticle, but mentions disassociation only in the context of stating that such microparticles "could be disassociated from automobile shredder residue perhaps in that they may be sloughed off or even shook off." 6:11-14. And it describes magnetic fuzz as having "low susceptance" without clearly defining that term. The patent expressly states that its use of the word "susceptance" is "not meant in a scientific manner," but does not clarify in what manner it *does* use the term. It sometimes defines the term "susceptance" circularly: "Susceptance may mean magnetic and microparticle

may mean low susceptance." 6:29-30. Other times, it seems to suggest that low susceptance material is material that is not readily-detected by magnetic sensors, although that "can be a function of size of the particles, a function of the properties of the particles (magnetic or not) or the like." 6:22-24. Still other times, the patent suggests that "low sensor susceptance" is exemplified by the fact that a substance with such low susceptance "may get stuck and may even clog in non-ferrous recovery system processing." 6:25-27.

The Court finds that the intrinsic evidence does not suggest that the phrase "magnetic fuzz" has a definite meaning. To the extent that such magnetic fuzz can be said to have certain characteristics – it is a microparticle; it has low susceptance – the patent fails to offer any meaningful and functional explanation of those characteristics. A person reading the patent would be unable to determine whether their own device was sorting the same substance that the patent calls "magnetic fuzz" because the nature of that substance is decidedly unclear. It may be less than an inch in some dimension, but it may also be more than an inch; it may avoid sensor detection because of its size, but it may also avoid sensor detection because of its minimal magnetic properties (indeed, it may apparently even be non-magnetic), or it may avoid sensor detection because of its density. The lack of a meaningful description of what constitutes magnetic fuzz prevents a person skilled in the art from knowing when it is present and how to address it.

Iqasr points to the affidavit of its expert, Daniel Shapiro, to demonstrate that the term "magnetic fuzz" is nevertheless readily understood by persons skilled in the art. None of these items of extrinsic evidence indicate that the term has a readily-understood definition in the field. To the contrary, at least one item, a question and answer from a 2017 scrap recycling convention

panel suggests the opposite. Mr. Shapiro quotes Dean Anderson, the inventor on the '432 Patent,

posing a question to panelist Tim Shuttlesworth:

> ANDERSON: Have you experimented around with using a high
> gauss magnet, some something in the 10-12000 gauss range to
> remove the lightly magnetic waste. You know, the ferritic dirt, the
> fuzzy ferrous, rust dust, magnetic fuzz, things like that? That
> throw away . . .
>
> SHUTTLESWORTH: The answer is yes, so uh.

What is notable about this exchange is the fact that Mr. Anderson was not able to pose his

question using only the term "magnetic fuzz" and have it be understood; rather, the question

resorted to several different labels – "lightly magnetic waste," "ferritic dirt," "fuzzy ferrous,"

"rust dust" – alongside "magnetic fuzz" in order to make its point clear.[5] This is particularly

troubling, insofar as Mr. Shapiro concedes that "a number of terms are commonly employed in

the scrap metal recycling industry to refer to items or substances having variable or even

unknown compositions" and that "it can be difficult to isolate the exact composition of all the

components." This suggests that whatever "magnetic fuzz" is, its composition is not particularly

describable and that it either goes by several names in the scrap metal industry or that there are

several similar substances that are difficult to distinguish from "magnetic fuzz."

To be sure, there is certainly extrinsic evidence that persons skilled in the art use the

word "fuzz" with some frequency (the construction "magnetic fuzz" is less common, at least

from Mr. Shapiro's cataloging of evidence). But it is not clear that all persons using the term are

---

[5] Mr. Shapiro's affidavit could be read to suggest that each of the listed items – "ferritic
dirt," "rust dust," "magnetic fuzz," etc. – are each distinct "components" of "lightly magnetic
waste" and not synonyms for the same substance. If so, there is no particular evidence in the
record that would demonstrate that persons skilled in the art all share Mr. Andersen's
understanding of the particular characteristics that make "magnetic fuzz" a distinctly-identifiable
substance.

using it to describe the same thing. Mr. Shapiro quotes from an article in "Recycling Today" and Wendt's own advertising, both of which refer to removing "dust and fuzz" from residue. But it is not clear whether the references to "dust and fuzz" are describing one substance or two, much less whether the "fuzz" in question is the same thing that the patent conceives of as "magnetic fuzz," as opposed to some other form of "lightly magnetic waste" (or even entirely non-magnetic waste).

Accordingly, the Court finds that the term "magnetic fuzz" is indefinite. Its size, composition, origin, and characteristics are all undefined by the patent. It is but one example of the genus of "microparticle," but other separately-identified members of that genus – "iron oxide particles" and "ferromagnetic particles," among others – would seem to share the characteristic of being at least partially magnetic. It is unclear from the record whether "magnetic fuzz" is the same as or different from iron oxide particles or ferromagnetic particles or rust dust or ferritic dirt or various other substances. To the extent each of these substances are distinct, it is not clear how a person skilled in the art would be able to differentiate one from the other, so as to know when they are removing magnetic fuzz in violation of the '432 Patent and when they are instead removing only rust dust or the like. To the extent these are all synonyms for the same substance, the record does not clearly reflect that "magnetic fuzz" is so commonly used and understood in the industry that a person reading the patent would necessarily know what particular substance is being described by that term. Thus, the term "magnetic fuzz" is indefinite.

(d). <u>recyclable materials</u>

Iqasr proposes that this term be construed to me "materials capable of being processed for salable reuse." Wendt contends that the term is indefinite, but if it must be construed, Wendt proposes that it be defined as "any metal or polymer (including plastics, leather, etc.), or any

combination of those materials or the like." The parties' briefing sharpens their dispute to the question of whether "salability" is a necessary component of a material being "recyclable." Wendt argues that because economic circumstances and technological changes over time can affect whether a given material can be recycled effectively and economically, it is inappropriate to define a material term of the patent by criteria that can change. Iqsar argues that the entire economic justification of the invention in the patent is its ability to recover recyclable materials for sale that are not currently being collected. It meets Wendt's argument by suggesting that, consistent with the authority cited by Wendt, the Court should fix the meaning of the term "recyclable materials" to those materials that were "salable" in 2011 when the patent was issued. *Citing PC Connector Solutions, LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1362-63 (Fed. Cir. 2005).

It is clear that the patent contemplates that "recyclable materials" will be those that have some economic value, as one of the clear purposes of the invention is to "recover[ ] recyclable components out of what was traditionally considered trash and was sent to the landfill." 8:8-9, *see also* 2:13-15 ("there is a need for a system to enhance separation of recyclable materials from auto shredder residue to provide . . . more recyclable products from what would otherwise be trashed"). The patent spends considerable time explaining the need for residue processors to conduct "economic balancing" to decide whether prices for recyclable material justify additional iterations of sorting or the purchase of additional machinery. *See generally* 9:23-11:42. Thus, the Court agrees with Iqasr that salability of recycled materials is an important component of the contested language.

The Court also rejects Wendt's contention that the term "recyclable materials" is indefinite because variations in local prices and other economic conditions might make a given

substance economically feasible to recycle in one location but not another. Iqasr's proposed construction adequately addresses this concern by defining "recyclable materials" to those that are <u>capable</u> of being salable, not necessarily those that <u>are</u> salable. Some materials may be capable of being recycled – because the technology to do so and a market for the recycled materials both exist – but which might not be appropriate for recycling in a given location for particularly local economic reasons. For example, although glass recycling is readily-available, an isolated processing location might not be able to produce sufficient quantities of glass to justify recycling it, or the present price for recycled glass might not overcome the costs of collection and transport. In such circumstances, glass is a material that is certainly <u>capable</u> of being recycled, even if it is not <u>actually</u> being recycled in the particular location. Thus, Wendt's argument that local economic conditions render Iqasr's proposed construction indefinite is without merit.

Accordingly, the Court adopts Iqasr's proposed construction, with the addition of a temporal limitation relating to the date of the patent. "Recyclable materials" is construed to mean "materials capable of being processed for salable reuse as of 2011."

(e). "<u>flowing vertical air</u>" and "<u>vertical path directed air sorting</u>"

Iqasr proposes that these terms be construed to mean "directing some air to travel vertically." Wendt contends that the terms are indefinite, but if not, it should be construed to mean "directing air to travel vertically." Wendt's indefiniteness argument focuses on Iqasr's proposal that only "some" air must travel vertically; Wendt argues that "if only 'some,' then how much?"

The Court is not necessarily persuaded that there is a fundamental difference in the parties' proposed constructions. "Directing some air" to travel in a given direction is, for

functional purposes, identical to "directing air" to travel in that direction. Air is not a resource that can be precisely and coherently directed, and any directed air flow will inevitably lose some of its volume to turbulence or redirection. To the extent Wendt's rhetorical question of "how much" air is "some" air warrants an answer, that answer is a simple one: enough air to accomplish the task. If enough air is directed vertically to accomplish the stated task, any reasonable person describing the process would acknowledge that "vertical air" was the mechanism of achievement, even if some inconsequential portion of that air flow veered off in another direction. Accordingly, the Court rejects Wendt's arguments as to these claim terms and adopts Iqasr's proposed constructions. "Flowing vertical air" is construed to mean "directing some air to travel vertically" and "vertical path directed air sorting" is construed to mean "sorting by air directed in a pathway in which some air flows vertically."

(f). "<u>low-susceptance microparticles</u>"

Iqasr proposes that this term be construed to mean "microparticles with low magnetic sensor susceptibility." Wendt contends that the term is too indefinite to permit any construction.

The Court's analysis of this term somewhat follows the discussion above regarding "magnetic fuzz." Although the patent uses the phrase "low susceptance" frequently, it offers no clear definition of the term and indeed, disclaims reliance on any "scientific" meaning. The patent states that "low susceptance microparticles may be . . . particles with low or magnetic or perhaps even low sensor susceptiblility." 6:18-20. This sentence's odd structure makes it difficult to unpack, but the use of "perhaps even" before "low sensor susceptibility" suggests that there are types of low-susceptance microparticles that do <u>not</u> have "low sensor susceptibility." The same conclusion flows from another sentence in the patent: "low susceptance microparticles may have low magnetic sensor susceptibility." 6:14-15. The use of the term "may" suggests

that there it is also possible for low susceptance microparticles to <u>not</u> have "low magnetic sensor susceptibility."

Iqasr does not point to any extrinsic evidence that would suggest that persons skilled in the art have a ready understanding of the term "low susceptance microparticles." Mr. Shapiro's affidavit does not point to any industry papers or reports or other communications where that phrase is used. He notes only that the dictionary definition of "susceptance" means "the character of being susceptible," but that simply begs the question: susceptible to what? Nothing in either the intrinsic or extrinsic evidence indicates that the susceptibility that the patent speaks of is, exclusively, susceptibility to magnetic sensors. Because the patent does not permit a clear understanding of what "low-susceptance microparticles" are, the Court finds that phrase to be indefinite and incapable of construction.

### B. Infringement contentions

Wendt moves **(# 130)** to supplement its infringement contentions, arguing that Iqasr's change in its proposed constructions of the patent's claims required Wendt to find different items of prior art.

Under the Court's Local Patent Rules, invalidity contentions are due at the time specified by the Scheduling Order. D.C. Colo. L. Pt. R. 8(a). The Scheduling Order **(# 41)** in this case set January 12, 2017 as the deadline for Wendt's invalidity contentions. However, the Scheduling Order also contemplated that invalidity contentions might change as a result of the claim construction process, as "Final Invalidity Contentions" are not due until several weeks "after service of [the] Claim Construction Order."

Wendt states that it served its initial invalidity contentions according to the Scheduling Order deadline, but that in March 2018, Iqasr amended its proposed construction of certain

claims in the patent.  Those amendments, Wendt contends, "significantly broaden[ed] the scope of the asserted patent claims," requiring Wendt to seek out new items of prior art that might anticipate the broader iteration of Iqasr's claims.  Wendt states that it eventually located an item of prior art that it wishes to rely upon, and in October 2018, filed the instant motion seeking to amend its invalidity contentions to include this item of prior art.  In response, Iqasr concedes that it changed its proposed construction of the claim terms in March 2018, but contends that those changes were immaterial; it alleges that the prior art that Wendt now intends to identify is "cumulative," as the patent in question has already been identified in another respect in Wendt's existing invalidity contentions; and it argues that the witness testimony Wendt intends to identify is not corroborated.  Notably, Iqasr does not articulate any prejudice that it claims it would suffer if Wendt's motion were granted.

The Court declines to wade deeply into the parties' dispute as to whether Iqasr's modification of its proposed claim construction was or was not material; to do so essentially invites this Court to engage in another round of claim construction analysis serving no useful purpose.  Instead, the Court is satisfied that it is undisputed that Iqasr did modify its infringement contentions in or about March 2018 and that Wendt began a search for additional prior art shortly thereafter.  Although that search took some six months, Iqasr has not disputed any aspect of the timeline presented by Wendt to explain the steps it took during that six month period.  Under these circumstances, the Court is satisfied that Wendt has demonstrated good cause for its request to modify its infringement contentions.  More importantly, Iqasr has not identified any prejudice that will result from granting Wendt's motion.  Indeed, by arguing that Wendt's new contentions are "cumulative," Iqasr essentially concedes that it is not prejudiced by Wendt making that contention formally.

Accordingly, Wendt's motion is granted. Wendt shall supplement its invalidity contentions within 14 days of this Order.

### C. Motions to restrict

Both sides have filed motions seeking to restrict public access to certain filings pursuant to D.C. Colo. L. Civ. R. 7.2.

Wendt moves (**# 150**) to restrict access to attorney billing records (**# 148** and supporting exhibits) that it submitted in response to an order of the Magistrate Judge (**# 140**) that authorized Wendt to recover attorney fees it incurred in a discovery dispute. Wendt argues that restriction of these documents is necessary to protect "confidential information regarding the amount it is spending on the present litigation," as well as its attorneys' interest in "confidential, competitive, and non-public information associated with billing rates, distribution of work, [etc.]"

The Court denies Wendt's motion. Wendt has requested that the Court grant it an award of attorney fees, and the appropriate amount of fees to be awarded is apparently a subject in dispute between the parties. The public has a profound interest in ensuring that the Court, as a public institution, is discharging its duties correctly. *See e.g. Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597-98 (1978). The public can only evaluate the correctness of the Court's ultimate fee award to Wendt if the public has access to the same documents that the Court considered. Thus, there is a strong public interest in having access to the records in question. The Court acknowledges Wendt's arguments about the privacy rights at issue here, but finds that those privacy rights must yield in the circumstances presented. Ordinarily, the Court would agree with Wendt that the public has no particular right to access information regarding Wendt's legal expenditures or the rates its counsel charged it. But Wendt put those expenditures at issue by requesting a fee award from the Court. Wendt was free to keep its legal expenditures private

by waiving any right to a judicially-enforceable fee award, or it could pursue such an award at the cost of making its legal expenditures public, but it cannot have both. Accordingly, the Court denies Wendt's motion and the provisional restrictions placed on Docket # 148 shall be lifted.

Iqasr's motion **(# 153)** relates to its own response **(# 151)** to Wendt's fee motion. Iqasr concedes that it has no particular privacy interest in any of the contents of that response, and that its motion is predicated simply on the fact that Iqasr's response discusses some of the same expenditures and billing rates that Wendt's own motion seeks to restrict. For the same reasons that the Court denies Wendt's motion, it denies Iqasr's motion as well. The provisional restrictions on Docket # 151 will be lifted.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the parties' Joint Motion **(# 120)** for determination of disputed claims, and the Court construes the '432 Patent as set forth above. Wendt's Motion to Exclude the Opinions of Michael Nranian **(# 108)** and Wendt's Motion to Supplement **(# 123)** its claim construction briefing are **DENIED**. Wendt's Motion to Supplement **(# 130)** its invalidity contentions is **GRANTED** and Wendt shall serve amended invalidity contentions within 14 days of this Order.

The motions by both parties to restrict (**#150, 153**) public access to certain filings are

**DENIED**, and the Clerk of the Court shall lift all restrictions on Docket # 148 and # 151.

Dated this 7th day of March, 2019.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge